UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL GUARINO and MARISSA GUARINO<br><br>Plaintiffs,<br><br>– v –<br><br>VYTALIZE HEALTH, INC.,<br><br>Defendants. | Civil Action No.<br><br>Jury Trial Demanded |

## COMPLAINT

Michael Guarino ("Mr. Guarino") and Marissa Guarino ("Ms. Guarino") (together, "Plaintiffs" or "Guarinos"), by and through their attorneys, Epstein, Becker & Green, P.C., as and for their Complaint against Vytalize Health, Inc. ("Defendant" or "Vytalize") allege as follows:

### PARTIES

1. Michael Guarino is an individual residing in Florida.

2. Marissa Guarino is an individual residing in Florida.

3. Upon information and belief, Vytalize is a Delaware corporation authorized to do business in New York, and maintains a place of business at 2 Hudson Place, Floor 6, Hoboken, New Jersey 07030.

### JURISDICTION

4. This Court has jurisdiction over this action because the parties have purposefully availed themselves by contract of this Court's exclusive jurisdiction for disputes concerning the parties' rights and obligations under the contracts at issue.

5. Jurisdiction is also proper pursuant to 28 U.S. Code § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

6. Venue is proper because the parties hereto have purposefully availed themselves, by contract, of exclusive venue in the United States District Court for the Southern District of New York for disputes concerning the parties' rights and obligations under the contracts at issue.

7. Venue is also proper pursuant to 28 U.S. Code § 1391(b)(2), (3).

## FACTUAL BACKGROUND

**A. Formation of Practice Management of America, Inc., and its Partners and Affiliates**

8. In 2011, Mr. Guarino founded an independent physician association that is now known as The Independent Physician Association of New York ("IPA NY").

9. IPA NY is one of the largest multi-specialty Independent Physician Associations ("IPAs") in the country with over 3,000 physician members. IPA NY is dedicated to improving the quality of care for patients across New York and promoting collaboration and coordination among independent physician practices to deliver high-quality patient-centered care.

10. In 2013, Mr. Guarino founded Practice Management of America, Inc. ("PMA").

11. PMA is a management service organization headquartered in New York that provides a variety of services, including management of independent physician practices, payor negotiation and strategic planning, billing and collection, clinical care management, group malpractice savings, human resources, payroll, and group purchasing benefits, across more than 1,000 locations.

12. PMA owns 100% of IPA NY and provides IPA NY with exclusive management services, including, but not limited to, clinical care management, care coordination, and administrative services.

13. In addition to the services PMA provides to its members and clients, PMA also has a number of strategic partnerships, alliances, and affiliations, which include:

    a. Glucose Guards, which was founded in partnership with PMA, is a diabetic management company that provides a platform to house "all things diabetes," including live webinars, blood glucose logbooks, analytics, and anonymized community forum, to assist patients with compliance issues. With approximately 5,000 users and a team of pharmacists, diabetic educators, and member navigators, Glucose Guards offers support to healthcare providers and employers to decrease costs tied to diabetes issues.

    b. Direct to Employer was a business line that provided revenue to PMA. It is a model that is designed to support employers who are self-funded. PMA supplied nurses, pharmacists, patient advocates, social workers, and additional clinical support staff.

    c. SAMI LLC was owned by PMA and the Guarinos. It is a program developed to support outreach initiatives by creating a customized message that is health services related and auto-dialed to members and patients.

**B. Vytalize's Acquisition of Majority Interest in PMA**

14. Vytalize describes itself as a "leading risk-bearing provider enablement platform" that provides "data-driven, Medicare-focused care delivery model in partnership with other practices." Vytalize promotes itself as having "designed a new care delivery system tailored specifically to Medicare patients" and "transform[ed] the healthcare experience for over two hundred and sixty thousand Medicare beneficiaries across 36 states."

15. IPA NY and Vytalize have had a longstanding business relationship since 2020.

16. At some point in 2020, Vytalize expressed an interest in acquiring IPA NY through an investment in PMA, IPA NY's management company.

17. The acquisition was intended to build upon the existing business relationship between IPA NY and Vytalize dating back to 2020, and help to grow Vytalize's business and accelerate its expansion into Medicare Advantage, commercial plans, Medicaid, and multi-specialty care.

18. The acquisition was also intended to help to accelerate the full potential of value-based care for PMA's robust network of primary and specialty care providers.

19. Accordingly, in anticipation of a potential purchase, PMA and Vytalize entered into two Convertible Promissory Notes, dated September 29, 2021, and March 29, 2022, respectively, whereby these instruments would convert into equity upon certain subsequent events.

          ***1.    Vytalize's Desire to Exclude Certain Companies and Program from the Purchase, and the Creation of Meta Care Inc.***

20. During the parties' negotiations of an equity purchase agreement, Vytalize informed Mr. Guarino that Vytalize did not wish to acquire an equity interest in certain companies and programs that were affiliated with PMA at that time, specifically Glucose Guards, Direct to Employer, or SAMI, as part of the transaction. Vytalize represented and stated to the Guarinos that these companies and programs do not fit within Vytalize's business model and should be excluded from any deal.

21. Accordingly, to accommodate Vytalize's desire to exclude Glucose Guards, Direct to Employer, and SAMI from the purchase, on January 11, 2023, Mr. Guarino founded Meta Care, Inc. ("Meta Care") and folded Glucose Guards, Direct to Employer, and SAMI into Meta Care's corporate structure so that these companies and programs would not be affiliated with PMA.

4

22. These actions were taken based upon Vytalize's representations and with Vytalize's knowledge, and consent.

23. Vytalize was aware of, did not object to, and consented to Meta Care's creation as well as Meta Care's incorporation of Glucose Guards, Direct to Employer, and SAMI prior to the purchase of PMA. Again, Vytalize specifically represented and directed that these companies/business lines were not to be included and would be excluded from any deal between Vytalize and PMA.

24. The mission of Meta Care, which stands for Motivated Entrepreneurs Taking Action, is partnering with other health care ventures to implement programs for independent physicians associations, physicians healthcare systems, and patients directly, empowering individuals to understand their health and maintain their well-being.

25. At no point has Meta Care competed or sought to compete—either directly or indirectly—with any of the products or services offered by Vytalize and PMA.

26. At no point has Glucose Guards, Direct to Employer, or SAMI ever competed or sought to compete—either directly or indirectly—with any of the products or services offered by Vytalize or PMA.

### 2. The Equity Purchase Agreement

27. On February 7, 2023, Vytalize, PMA, the equity holders of PMA, and Mr. Guarino in his capacity as representative of the equity holders of PMA entered into an Equity Purchase Agreement (the "Equity Purchase Agreement") for the sale of certain shares in PMA.

28. Pursuant to the Equity Purchase Agreement, Vytalize acquired a 50.1% majority interest in PMA in exchange for certain Cash Payments as defined in the Agreement and subject to the terms and conditions set forth therein.

29. Mr. and Ms. Guarino, along with other stockholders, own the remaining 49.9% of the outstanding stock of PMA.

30. Pursuant to, and concurrent with, the Equity Purchase Agreement, the parties also entered into a number of ancillary agreements in further consideration for the sale of PMA shares.

### 3. The Amended and Restated Stockholders' Agreement

31. Pursuant to the Equity Purchase Agreement, on February 7, 2023, PMA, Vytalize, Mr. Guarino, and certain Rollover Holders concurrently entered into an Amended and Restated Stockholders' Agreement (the "Amended Stockholders' Agreement").

32. The purpose of the Amended Stockholders' Agreement was, among other things, "to provide restrictions on the disposition of the Company's [PMA's] securities" and "to create certain options with respect to such securities."

33. Specifically, Section 3.4(c) of the Amended Stockholders' Agreement provides that, during the Option Window—defined as "the three-month period commencing on the later of (x) April 1, 2024 and (y) the delivery by the Company [PMA] to Vytalize of the Company's [PMA's] 2023 reviewed financials—the "Non-Vytalize Stockholders," meaning "each Stockholder other than Vytalize," shall have the option to require Vytalize to purchase all, but not less than all, of the Securities held by the Non-Vytalize Stockholders (the 'Put Option')" on certain terms and conditions, and in exchange for "an amount equal to (x) the Option Exercise Price times (y) the number of shares of Common Stock on a Fully-Diluted Basis represented by the Securities held by such Non-Vytalize Stockholder . . . ."

34. Section 1.1. defines the Option Exercise Price as:

"[I]n each case, in the reasonable determination of the Board, an amount equal to (a) the quotient of (i) $120,000,000 divided by (ii) 1,155,793.81 plus (b) the quotient of (i) the excess, if any, of (A) the product of (I) the Gross Profit of the Company for the twelve month period ending December 31, 2023, multiplied by

(II) 5.96, minus (B) $110,000,000, divided by (ii) 1,155,793.81, minus (c) the quotient of (i) Seller Expenses divided by (ii) the total number of shares of Common Stock held by all Non-Vytalize Stockholders as of the date of determination of the Option Exercise Price."

35. In other words, as part of the consideration for the sale of PMA, the Non-Vytalize Stockholders, including Mr. and Ms. Guarino, were entitled to exercise the "Put Option" and require Vytalize to purchase the remaining outstanding shares of PMA subject to certain terms.

36. The "Put Option" was a material, bargained-for contractual condition of the sale and, upon information and belief, was valued at a minimum of $60 million to the PMA shareholders, representing 49.9% of their shares. This amount does not include any potential earn out for earnings that occurred in calendar year 2023.

37. Exhibit D to the Amended Stockholders' Agreement also set forth the "PMA 2023 Financial Budget and Post-Close Business Plan," the purpose of which was to "align on the various aspects of the business, determine priorities and goals where feasible, describe the operations, and lay out the division of responsibilities between" PMA, IP NY, and Vytalize "post acquisition."

38. To date, Vytalize failed to implement the PMA Post Close Business Plan in several material respects, including, but not limited to:

    a. Failing to develop, process, review, and approve contracts in a prompt and efficient manner;

    b. Failing to establish and implement communication strategies, tools, teams, and processes;

    c. Failing to work collaboratively with the Guarinos on the various business lines;

    d. Failing to hold regularly scheduled board meetings;

    e. Failing to develop required training;

  f. Failing to sufficiently use certain specialized programs;

  g. Excluding Mr. and Ms. Guarino from business meetings and strategies; and

  h. Failing to promptly respond to Mr. and Ms. Guarino's concerns;

39. Vytalize's actions negatively impacted the growth of PMA's business.

40. As a result of Vytalize's actions, the value of the "Put Option" and the Guarino's shares have been materially and negatively impacted.

### 4. Mr. and Ms. Guarino's Employment Agreements with PMA

41. The Equity Purchase Agreement further provides that "as a further inducement and as a condition to the consummation of the transactions contemplated hereby by Buyer [Vytalize], each of the Key Employees"—defined as "Michael Guarino, Marissa Guarino, Christopher Ng, M.D., and Mish Gonzalez, M.D."—will enter into an employment agreement with the Company [PMA], effective as of the Closing (collectively, the 'Employment Agreements'), providing for continued employment with the Company [PMA] and certain restrictive covenant obligations which shall insure to the benefit of, and be enforceable by, and be binding upon, the parties thereto and their respective successors and assigns . . . ."

42. Concurrent with the execution of the Equity Purchase Agreement, on February 7, 2023, PMA and Mr. Guarino also entered into an Employment Agreement ("Mr. Guarino's Employment Agreement"), whereby Mr. Guarino would serve as PMA's President for a period of at least two years in exchange for a salary of $750,000 per year and other benefits.

43. Similarly, on February 7, 2023, PMA and Ms. Guarino also entered into an Employment Agreement ("Ms. Guarino's Employment Agreement"), whereby Ms. Guarino would serve as PMA's Chief Operating Officer for a period of two years in exchange for a salary of $375,000 per year and other benefits.

44. Mr. and Ms. Guarino's continued employment at PMA were material, bargained-for contractual conditions on the sale of PMA's majority stock to Vytalize.

45. While Mr. and Ms. Guarino's Employment Agreements were with PMA, post-closing, all of PMA's accounting, human resources, marketing, compliance, and legal departments were centralized within Vytalize. Upon information and belief, Kevin Murphy ("Mr. Murphy"), the Chief Financial Officer of Vytalize, is also the Chief Financial Officer of PMA, and he signed and executed the Employment Agreements on behalf of PMA. The Employment Agreements state that PMA is a "subsidiary corporation of Vytalize." Through the actions of Mr. Murphy and others associated with and/or representing Vytalize, Vytalize manifested an intent to be bound by the Employment Agreements and/or was otherwise sufficiently in control of PMA post-closing to be deemed a party to Mr. and Ms. Guarino's Employment Agreements.

46. At all times prior to and after the sale of PMA in February 2023, Vytalize was aware that Mr. and Ms. Guarino had interests and were actively involved in businesses other than PMA, including Meta Care, Glucose Guards, Direct to Employer, and SAMI. Because of this, Mr. and Ms. Guarino's Employment Agreements with PMA expressly provided for, and authorized, certain outside employment activities.

47. Exhibit A to both Employment Agreements is a "Non-Disclosure/Non-Solicitation/Non-Competition and Invention Assignment Agreement" (the "RCA Agreement").

48. Schedule A of Mr. Guarino's RCA Agreement lists the following as "Interests/Involvements in Other Companies" that are "Permitted Outside Activities":

> "1. Advisory Board Member for, and equityholder of, Stellar Health
>  2. Advisory Board Member for Elevance Health
>  3. Administrator for ASC in Ocala Florida]
>  4. Consultant to North Shore Surgi-Center
>  5. Equityholder in Care2U
>  6. Equityholder Glucose Guards, LLC

>    7. Chief Financial Officer of A.M. Surgical"

49. Likewise, Schedule A of Ms. Guarino's RCA Agreement lists the following as "Interests/Involvements in Other Companies" that are "Permitted Outside Activities":

> "1. Equityholder in Care2U
> 2. Equityholder Glucose Guards, LLC
> 3. All activities related to the inventions set forth on Exhibit 1"

50. Consistent with this, Section 3 of the RCA, relating to "Conflicting Employment," specifically excludes Mr. and Ms. Guarino's "interests or involvements with the companies listed on Schedule A." It also only and restricts Mr. and Ms. Guarino's "employment, occupation or consulting relating to the business in which the Company [PMA] is now involved or becomes involved . . ." or that "materially conflicts" with their obligations to PMA.

51. Likewise, Section 2.B. of their Employment Agreements, governing Mr. and Ms. Guarino's "Commitment" to PMA, excludes "Permitted Outside Activities" and restricts them only from "hold[ing] an interest, directly or indirectly, in any form, fashion, or manner, as partner, officer, director, stockholder, advisor, employee, or in any other form or capacity, in any business *in direct competition with the Company's business*" or "maintain[ing] concurrent employment that in any way interferes with the performance" of their duties for PMA. (emphasis added).

52. The RCA Agreement defines "the Company's [PMA's] business" as "the operation of a Medicare Accountable Care Organization (ACO) partnering with primary care doctors, operating other Medicare value-based care programs, and each other material portion of the business of the Company and its subsidiaries." Moreover, the RCA Agreement states that this "*shall not include any business that solely provides products or services to direct or indirect competitors of the Company so long as such business does not directly compete with the Company's Business.*" (emphasis added).

53. Given Mr. and Ms. Guarino's active interest and involvement in other business, these terms were material, bargained-for contractual conditions of their Employment Agreements.

54. Mr. and Ms. Guarino's Employment Agreements also contain specific restrictions on the manner of their termination.

55. Section 5.B. of Mr. and Ms. Guarino's Employment Agreements states that, "prior to the two-year anniversary of the Effective Date," or February 7, 2025, PMA "shall only be permitted to terminate the Employee's employment with the Company for Cause."

56. "Cause" is defined in the Agreements as:

"(i) Employee's indictment (x) for a felony (other than motor vehicle offenses) or, (y) on account of action taken by the Employee constituting theft, embezzlement, or other fraudulent action against the Company; (ii) Employee's conviction of, or plea of nolo contendere to, a felony or crime of moral turpitude; (iii) an act by the Employee constituting fraud on or misappropriation of any funds or property of the Company or an affiliate, customer or vendor of the Company; (iv) an act by the Employee constituting material dishonesty, misconduct, or breach of fiduciary duty, in each case, while acting within the scope of Employee's employment with the Company, each as determined by the Company in its reasonable discretion based on objective evidence of the same; (v) Employee's misconduct in connection with their employment by the Company hereunder, failure to perform Employee's duties under this Agreement including as defined in the PMA Business Plan or as delineated by the board of directors of the Company, or Employee's refusal to perform the reasonable directives of the Company in accordance with this Agreement, which has not been cured, if curable, within thirty (30) days following written notice from the Company to the Employee reasonably describing such misconduct, failure or refusal; (vi) Employee's material violation of any written Company rule, regulation, procedure or policy including the Employee Handbook and Code of Conduct which have been made available to Employee, and which violation has not been cured, if curable, within thirty (30) days following written notice from the Company to the Employee reasonably describing such violation; (vii) Employee's material breach of any provision of this Agreement or any non-disclosure, non-competition, non-solicitation or other similar agreement between the Employee and the Company, which Employee fails to cure, if curable, to the reasonable satisfaction of the Company within thirty (30) days of the Employee's receipt of written notice from Company describing such breach; or (viii) Employee's failure to provide prompt notice of a compliance, regulatory, or personnel matter to the Vytalize Health, Inc. Chief Compliance Officer or VP of People Operations."

57. Therefore, under subsections (v), (vi), and (iv) of Section 5.B., governing any alleged misconduct, failure to perform duties, violation of PMA's rules, regulations, procedures, or policies, or material breach of any provision of the Employment Agreement or the RFA Agreement, PMA was required to provide Mr. and Ms. Guarino with written notice describing such breach and allow them thirty (30) days to cure any perceived violation.

### C. Mr. and Ms. Guarino's Dutiful Performance of Their Obligations to PMA

58. Between February 7, 2023 and November 14, 2023, Mr. Guarino and Ms. Guarino dutifully performed their duties as President and Chief Operating Officer, respectively, of PMA.

59. During this time, Vytalize management instructed the Guarinos to allow the Vytalize team to perform day-to-day management and strategy of PMA and instructed the Guarinos to take on an "advisory role" at PMA. Upon information belief, this was done in an effort to minimize the Guarinos' respective roles in PMA.

60. During this time, as permitted under their Employment Agreements, and as Vytalize was well aware, Mr. Guarino and Ms. Guarino also continued their roles and involvements in their other businesses.

61. In particular, Mr. Guarino and Ms. Guarino continued to grow Meta Care and, in or around October of 2023, Meta Care incorporated a new company, EnCounter Billing, LCC ("EnCounter Billing"), a billing service.

62. EnCounter Billing provides billing and collection services to, among others, Glucose Guards in New York. Prior to doing so, this was approved by the CEO of Vytalize.

63. EnCounter Billing does not provide any services to clients in New York or New Jersey markets outside of what has previously been approved by Vytalize.

64. EnCounter Billing does not compete with any products or services offered by PMA in New York or New Jersey.

65. At all relevant times, Vytalize was aware of Mr. and Ms. Guarino's involvement in Meta Care and that Meta Care was providing services, including billing services via EnCounter, to, among others, Glucose Guards.

66. In fact, at a September 29, 2023 meeting, Mr. Murphy, the Chief Executive Officer of Vytalize, approved Meta Care providing such services.

67. Although multiple people and businesses have approached Mr. and Ms. Guarino about switching their billing to EnCounter Billing, Mr. and Ms. Guarino have consistently declined these opportunities out of consideration for their duties and obligations to PMA.

68. Vytalize was also aware at all times that certain PMA employees were hired by Meta Care and, in some circumstances, these hires were made at the request of Vytalize itself.

69. Ms. Guarino had multiple meetings with representatives of Vytalize in August, September and October 2023 about how to transition these employees from PMA to Vytalize.

70. However, ultimately, there were several PMA employees for whom Vytalize had no open positions, and, as a result, Vytalize asked Ms. Guarino whether Meta Care could hire these employees instead, which Meta Care agreed to do at Vytalize's request.

71. At times, some of the employees that Meta Care hired at the request of Vytalize provided services to PMA and Vytalize. However, in these instances, and out of consideration for the partnership and collaboration between Meta Care, Vytalize, and PMA, Meta Care never charged PMA or Vytalize for any of the services that these employees provided.

72. There was also an agreement and understanding between Vytalize, PMA, and Meta Care that certain employees of PMA could work on maters for Meta Care while employed by

PMA. None of the work these individuals performed for Meta Care interfered or conflicted in any way with their duties or obligations owed to PMA.

73. Vytalize was aware of, and approved, this arrangement at all times.

**D.  Mr. and Ms. Guarino's Discovery of Vytalize's Potential Violation of Privacy Laws**

74. On or about September 13, 2023, Mr. and Ms. Guarino discovered that Vytalize had installed certain employee activity monitoring software on their personal computers without their knowledge or consent.

75. Other employees of PMA, and IPA Physician providers, also informed Mr. and Ms. Guarino that similar software had been installed by Vytalize on their personal computers without their knowledge or consent.

76. At no point prior to this had PMA or Vytalize notified employees that such software would be installed on their personal computers, or sought their consent to do so.

77. Upon learning of this, and believing it to be a potential serious violation of applicable state and federal laws, Mr. and Ms. Guarino promptly raised this issue with the PMA Board of Directors, and sought immediate remedial action.

78. However, the PMA Board refused Mr. and Ms. Guarino's recommendation to hire outside independent counsel and conduct an investigation.

**E.  Vytalize's Abrupt Termination of Mr. and Ms. Guarino Without Cause or Notice**

79. Instead, on November 14, 2023, without any notice or the contractually required opportunity to cure, Vytalize unilaterally and pretextually terminated Mr. and Ms. Guarino's employment with PMA "for Cause."

80. As for stated reasons of "Cause," and despite being aware at all times of Mr. and Ms. Guarino's role and involvement in Meta Care, Vytalize generically and falsely stated "it has come to our attention that you are currently engaged in activities, through Meta Care, Inc. and its affiliates ("Meta Care"), that directly compete and interfere with the business offerings and operations of the Company [PMA] in contravention of your legal obligations to the Company [PMA]."

81. Specifically, Vytalize stated that, "on October 23, 2023," Meta Care "sent a communication soliciting its products and services to numerous IPANY practices," and, as a result of this purported communication, Mr. and Ms. Guarino's "ownership and operation of Meta Care and Encounter Billing, and the solicitation described [], violate [] [their] fiduciary duties to the Company [PMA] and constitute misconduct and incurable breaches of [] [their] obligations not to compete against the Company [PMA] and its own full-service billing offerings provided by Salus Billing, interfere with the Company's [PMA's] business relationships, and solicit its customers."

82. Vytalize also broadly claimed, for the first time, that Mr. and Ms. Guarino's "ownership and operation of Meta Care and Encounter Billing also constitute material breaches of [] [their] obligations to perform [] [their] duties faithfully and devote [] [their] 'full time' to the Company [PMA] under the Employment Agreement" and their "unfettered access to the Company's [PMA's] Confidential Information, including in [] [their] role as the sole manager of Salus Billing, is now being misused to improperly benefit Meta Care and [] [their] other businesses, including Encounter Billing, at the Company's [PMA's] expense."

83. Vytalize did not specify what, if any, "Confidential Information" had been "misused improperly" by either Mr. or Ms. Guarino to benefit Meta Care or other businesses.

15

84. Vytalize further claimed Mr. and Ms. Guarino had improperly solicited PMA employees to "conduct personal, competitive business on behalf of Meta Care" and had "engaged in material dishonesty, misconduct and breaches" by "discrediting the Company's [PMA's] security efforts and software."

85. At the same time, Vytalize also stripped Mr. and Ms. Guarino of their roles as members of the Board of Directors of PMA as well as their observer roles at Vytalize.

86. At no point prior to unilaterally terminating Mr. and Ms. Guarino did Vytalize or PMA provide any written notice to either of them of a perceived breach, nor did Vytalize or PMA permit either Mr. or Ms. Guarino any opportunity to cure the perceived breach as required under their respective Employment Agreements.

87. Vytalize's termination of Mr. and Ms. Guarino was unlawful and devoid of any factual basis.

88. Upon information and belief, Vytalize's sudden and unliteral termination of Mr. and Ms. Guarino is merely a backhanded attempt by Vytalize to avoid its financial obligations under the Employment Agreement and Amended Stockholders Agreement and retaliate against them for raising potential violations of applicable law.

89. As a direct result of Vytalize's conduct, Mr. and Ms. Guarino have been deprived of the benefit of the relevant contracts and have suffered significant economic injury in an amount to be determined at trial but no less than $ 75 million.

**FIRST CAUSE OF ACTION**
**(Breach of Contract—Employment Agreements)**

90. Plaintiffs repeat and reallege each and every allegation above as though set forth fully herein.

91. The respective Employment Agreements of Mr. and Ms. Guarino are valid and enforceable contracts that set forth the rights and obligations of Plaintiffs and Defendant.

92. Plaintiffs have performed all of their respective obligations under their respective Employment Agreements.

93. Defendant has breached Plaintiffs' respective Employment Agreements by, among other things, terminating Mr. and Ms. Guarino without cause and without any written notice or an opportunity to cure.

94. As a result of Defendant's breaches, Plaintiffs have suffered damages.

## SECOND CAUSE OF ACTION
### (Breach of Contract—Amended Stockholders' Agreement)

95. Plaintiffs repeat and reallege each and every allegation above as though set forth fully herein.

96. The Amended Stockholders' Agreement is a valid and enforceable contract that sets forth the rights and obligations of Plaintiffs and Defendant.

97. Plaintiffs have performed all of their respective obligations under the Amended Stockholders' Agreement.

98. Defendant has breached the Amended Stockholders' Agreement by, among other things, preventing Plaintiffs from exercising the Put Option, and interfering with the Post-Close Business Plan.

99. As a result of Defendant's breaches, Plaintiffs have suffered damages.

## THIRD CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

100. Plaintiffs repeat and reallege each and every allegation above as though set forth fully herein.

101. The Equity Purchase Agreement, the Employment Agreements, and the Amended Stockholders' Agreement were entered into by Plaintiffs and Defendant for good and valuable consideration, and constitute valid, binding, and enforceable contracts.

102. Implied within each of the agreements is a covenant of good faith and fair dealing, which obligates Defendant to act at all times in good faith towards Plaintiff and prohibits Defendant taking action, or failing to take any action, that has the effect of destroying or injuring the rights of Plaintiffs under these agreements.

103. Defendant's conduct breached the implied covenant of good faith and fair dealing in the Equity Purchase Agreement, the Employment Agreements, and the Amended Stockholders' Agreement because Defendant's improper termination of Plaintiff was intended to, and, in fact did, substantially destroy and injure Plaintiffs' rights and expectations under these agreements.

104. Upon information and belief, the acts and omissions of Defendant as set forth herein were committed in bad faith, intentionally and/or with conscious and reckless disregard for Plaintiff's rights under the Equity Purchase Agreement, the Employment Agreements, and the Amended Stockholders' Agreement. Defendant's motivation in terminating Plaintiffs' respective employments was to escape its financial obligations to Plaintiffs under the terms of the contracts, which Plaintiffs have paid a substantial sum to guarantee.

105. As a result of Defendant's conduct, Plaintiffs have suffered damages.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

106. Plaintiffs repeat and reallege each and every allegation above as though set forth fully herein.

107. Defendant has been unjustly enriched at Plaintiffs' expenses.

108. As a result of Defendant's conduct, Plaintiffs' have suffered damages, and it would be inequitable to allow Defendant to retain those enrichments.

### FIFTH CAUSE OF ACTION
### (Declaratory Judgment)

109. Plaintiffs repeat and reallege each and every allegation above as though set forth fully herein.

110. An actual controversy of a justiciable nature presently exists between Plaintiffs and Defendant concerning the proper construction of the terms of the Equity Purchase Agreement, the Employment Agreements, and the Amended Stockholders' Agreement, and the rights and obligations of the parties thereto.

111. Plaintiffs are entitled to a declaration by this Court of the parties' rights and obligations under the Equity Purchase Agreement, the Employment Agreements, and the Amended Stockholders' Agreement.

112. The issuance of declaratory relief by this Court will terminate the existing controversy between Plaintiffs and Defendant, settling and affording relief from uncertainty with respect to the rights and obligations of the parties under the Equity Purchase Agreement, the Employment Agreements, and the Amended Stockholders' Agreement.

113. As a result of the foregoing, Plaintiff seeks a declaratory judgment setting forth the existence, scope, and breach of Defendant's obligations.

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

a) A declaratory judgment setting forth the rights and obligations of the parties;

    b)    Ordering Defendant to perform and comply with Section 3.4(c) of the Amended Stockholders' Agreement regarding the purchase of the remaining outstanding stock of PMA;

    c)    Ordering the 1,000,000 share options of Vytalize stock that Mr. Guarino received three (3) years ago to be re-instated at the original agreed upon price;

    d)    Ordering Defendant to reinstate Plaintiffs to the Board of Directors of PMA, and to allow Plaintiffs to attend monthly meetings pursuant to the "Post Closing Business Plan" under the Amended Stockholders' Agreement;

    e)    Awarding Plaintiffs full compensatory and consequential damages in an amount to be determined at trial, together with pre- and post-judgment interest and costs;

    f)    Granting Plaintiff such other and further relief as is just and proper.

Dated: January 18, 2024  
       New York, New York

EPSTEIN BECKER & GREEN, P.C.

By: _____  
Shruti Panchavati  
875 Third Avenue  
New York, New York 10022  
(212) 351-4633  
SPanchavati@ebglaw.com  
*Attorneys for Plaintiffs*