**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| MICHAEL GUARINO and MARISSA GUARINO, | : : : : | |
| Plaintiffs, | : : | Civil Case No. 1:24-cv-00403 (MKV) (KHP) |
| v. | : : | |
| VYTALIZE HEALTH, INC., | : : | |
| Defendant. | : : | |

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant Vytalize Health LLC (incorrectly named herein as "Vytalize Health, Inc.") ("Vytalize"), by and through its undersigned counsel, submits this Answer, Affirmative Defenses and Counterclaims in response to the complaint filed by Plaintiffs Michael and Marissa Guarino (together, the "Plaintiffs") in the above-captioned matter (the "Complaint").

## PARTIES

1.    Admitted.

2.    Admitted.

3.    Admitted.

## JURISDICTION

4.    Vytalize admits that this Court has jurisdiction over this action but denies the remaining allegations of paragraph "4" of the Complaint.

5.    Vytalize admits that this Court has jurisdiction pursuant to 28 U.S. Code § 1332 but denies that the Plaintiffs are entitled to any relief sought in the Complaint.

6.    Vytalize admits that venue is proper in the United States District Court for the Southern District of New York but denies the remaining allegations of paragraph "6" of the Complaint.

7.    Admitted.

## FACTUAL BACKGROUND

8.    Vytalize lacks sufficient knowledge upon which to admit or deny the allegations of paragraph "8" of the Complaint and therefore denies same.

9.    Admitted.

10.    Vytalize lacks sufficient knowledge upon which to admit or deny the allegations of paragraph "10" of the Complaint and therefore denies same.

11.    Admitted.

12.    Admitted.

13.    Vytalize admits that, in addition to the services PMA provides to its members and clients, PMA also has a number of strategic partnerships, alliances and affiliations but denies the remaining allegations of paragraph "13" of the Complaint.

a.    Vytalize lacks sufficient knowledge upon which to admit or deny any allegations characterizing the scope of Glucose Guards' business and therefore denies same and the remaining allegations of paragraph "13(a)" of the Complaint.

b.    Vytalize lacks sufficient knowledge upon which to admit or deny any allegations characterizing the scope of Direct to Employer's business and therefore denies same and the remaining allegations of paragraph "13(b)" of the Complaint.

c.    Vytalize lacks sufficient knowledge upon which to admit or deny any allegations characterizing the scope of SAMI LLC's business and therefore denies same and the remaining allegations of paragraph "13(c)" of the Complaint.

14.    Admitted.

15.    Vytalize admits that it has had a business relationship with IPA NY since 2020 but denies the remaining allegations of paragraph "15" of the Complaint.

16.    Vytalize admits that it expressed an interest in acquiring IPA NY through an investment in PMA but denies the remaining allegations of paragraph "16" of the Complaint.

17.    Vytalize admits that the acquisition was intended to build upon the existing business relationship between IPA NY and Vytalize but denies the remaining allegations of paragraph "17" of the Complaint.

18.    Admitted.

19.    Vytalize admits that PMA and Vytalize entered into two Convertible Promissory Notes dated September 29, 2021 and March 29, 2022 but denies the remaining allegations of paragraph "19" of the Complaint.

20.    Vytalize admits that it did not wish to acquire any equity interest in Glucose Guards, Direct to Employer, or SAMI but denies the remaining allegations of paragraph "20" of the Complaint.

21.    Vytalize lacks sufficient knowledge upon which to admit or deny the allegations characterizing Mr. Guarino's motives and actions in paragraph "21" of the Complaint and therefore denies same and the remaining allegations of paragraph "21" of the Complaint. Further answering, Vytalize denies that Mr. Guarino founded Meta Care on January 11, 2023.

22.     Vytalize lacks sufficient knowledge upon which to admit or deny the allegations in paragraph "22" of the Complaint and therefore denies same.

23.     Vytalize admits that it did not wish to acquire any equity interest in Glucose Guards, Direct to Employer and SAMI as a part of Vytalize's acquisition of PMA but denies the remaining allegations of paragraph "23" of the Complaint.

24.     Vytalize lacks sufficient knowledge upon which to admit or deny the allegations in paragraph "24" of the Complaint and therefore denies same.

25.     Denied.

26.     Denied.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Admitted.

32.     The Amended Stockholders' Agreement speaks for itself and, therefore, no response is required. Further answering, Vytalize denies any characterization of the purpose of the Amended Stockholders' Agreement in paragraph "32" of the Complaint.

33.     The Amended Stockholders' Agreement speaks for itself and, therefore, no response is required. Further answering, Vytalize denies any characterization of the Amended Stockholders' Agreement in paragraph "33" of the Complaint.

34.     The Amended Stockholders' Agreement speaks for itself and, therefore, no response is required. Further answering, Vytalize denies any characterization of the purpose of the Amended Stockholders' Agreement in paragraph "34" of the Complaint.

35.    The Amended Stockholders' Agreement speaks for itself and, therefore, no response is required. Further answering, Vytalize denies the allegations and any characterization of the Amended Stockholders' Agreement in paragraph "35" of the Complaint.

36.    Vytalize admits that that the "Put Option" was valued at a minimum of $60 million to the PMA shareholders, representing 49.9% of their shares and not including potential earn out for earnings in the calendar year 2023, but denies the remaining allegations of paragraph "36" of the Complaint.

37.    Admitted.

38.    Denied.

      a.    Denied.

      b.    Denied.

      c.    Denied.

      d.    Denied.

      e.    Denied.

      f.    Denied.

      g.    Denied.

      h.    Denied.

39.    Denied.

40.    Denied.

41.    The Equity Purchase Agreement speaks for itself and, therefore, no response is required. Further answering, Vytalize denies any characterization of the Equity Purchase Agreement in paragraph "41" of the Complaint.

42.     Vytalize admits that, on February 7, 2023, PMA and Mr. Guarino entered into Mr. Guarino's Employment Agreement but denies the remaining allegations and any characterization of Mr. Guarino's Employment Agreement in paragraph "42" of the Complaint.

43.     Vytalize admits that, on February 7, 2023, PMA and Ms. Guarino entered into Ms. Guarino's Employment Agreement but denies the remaining allegations and any characterization of Ms. Guarino's Employment Agreement in paragraph "43" of the Complaint.

44.     Denied.

45.     Vytalize admits that Kevin Murphy was the Chief Financial Officer of Vytalize and that Mr. Murphy signed and executed the Employment Agreements on behalf of PMA but denies the remaining allegations of paragraph "45" of the Complaint.

46.     Denied.

47.     Admitted.

48.     Mr. Guarino's RCA Agreement, including its Schedule A, speaks for itself and, therefore, no response is required. Further answering, Vytalize denies any characterization of the RCA Agreement in paragraph "48" of the Complaint.

49.     Ms. Guarino's RCA Agreement, including its Schedule A, speaks for itself and, therefore, no response is required. Further answering, Vytalize denies any characterization of the RCA Agreement in paragraph "49" of the Complaint.

50.     The Employment Agreements speak for themselves and, therefore, no response is required. Further answering, Vytalize denies the allegations and any characterization of the Employment Agreements in paragraph "50" of the Complaint.

51.    The Employment Agreements speak for themselves and, therefore, no response is required. Further answering, Vytalize denies the allegations and any characterization of the Employment Agreements in paragraph "51" of the Complaint.

52.    The RCA Agreements speak for themselves and, therefore, no response is required. Further answering, Vytalize denies any characterization of the RCA Agreements in paragraph "52" of the Complaint.

53.    Denied.

54.    Admitted.

55.    The Employment Agreements speak for themselves and, therefore, no response is required. Further answering, Vytalize denies any characterization of the Employment Agreements in paragraph "55" of the Complaint.

56.    The Employment Agreements speak for themselves and, therefore, no response is required. Further answering, Vytalize denies any characterization of the Employment Agreements in paragraph "56" of the Complaint.

57.    The Employment Agreements and RCA Agreements speak for themselves and, therefore, no response is required.  Further answering, Vytalize denies any characterization of the Employment Agreements or RCA Agreements in paragraph "57" of the Complaint.

58.    Denied.

59.    Denied.

60.    Vytalize lacks sufficient knowledge upon which to admit or deny any allegations characterizing the scope of the Guarinos' roles and involvements in their other business and therefore denies same and the remaining allegations of paragraph "60" of the Complaint.

61.    Vytalize admits that the Guarinos incorporated EnCounter Billing but lacks sufficient knowledge upon which to admit or deny the remaining allegations in paragraph "61" of the Complaint and therefore denies same.

62.    Vytalize admits that EnCounter Billing provides billing and collection services but denies the remaining allegations of paragraph "62" of the Complaint.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Vytalize admits that multiple people and businesses have approached the Guarinos about switching their billing to EnCounter Billing but lacks sufficient knowledge upon which to admit or deny the remaining allegations in paragraph "67" of the Complaint and therefore denies same.

68.    Denied.

69.    Vytalize admits that Ms. Guarino met with representatives of Vytalize in 2023 about how to transition employees from PMA to Vytalize but denies the remaining allegations of paragraph "69" of the Complaint.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

76. Denied.

77. Denied.

78. Denied.

79. Vytalize admits that, on November 14, 2023, the Guarinos' employment with PMA was terminated for Cause but denies the remaining allegations in paragraph "79" of the Complaint.

80. The text of the letters referenced in paragraph "80" of the Complaint speaks for itself and, therefore, no response is required. Further answering, Vytalize denies the allegations and any characterization of the letters referenced in paragraph "80" of the Complaint.

81. The text of the letters referenced in paragraph "81" of the Complaint speaks for itself and, therefore, no response is required. Further answering, Vytalize denies the allegations and any characterization of the letters referenced in paragraph "81" of the Complaint.

82. The text of the letters referenced in paragraph "82" of the Complaint speaks for itself and, therefore, no response is required. Further answering, Vytalize denies the allegations and any characterization of the letters referenced in paragraph "82" of the Complaint.

83. Denied.

84. The text of the letters referenced in paragraph "84" of the Complaint speaks for itself and, therefore, no response is required. Further answering, Vytalize denies the allegations and any characterization of the letters referenced in paragraph "84" of the Complaint.

85. Vytalize admits that it removed and terminated the Guarinos from their roles as members of the Board of Directors of PMA and their observer roles at Vytalize.

86. Denied.

87. Denied.

88. Denied.

89.     Denied.

## FIRST CAUSE OF ACTION
### (Breach of Contract—Employment Agreements)

90.     No response is required to paragraph "90." To the extent that a response is required, Vytalize repeats and incorporates by reference its answers to paragraphs "1" through "89" as if fully set forth herein.

91.     Admitted.

92.     Denied.

93.     Denied.

94.     Denied.

## SECOND CAUSE OF ACTION
### (Breach of Contract—Amended Stockholders' Agreement)

95.     No response is required to paragraph "95." To the extent that a response is required, Vytalize repeats and incorporates by reference its answers to paragraphs "1" through "94" as if fully set forth herein.

96.     Admitted.

97.     Denied.

98.     Denied.

99.     Denied.

## THIRD CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

100.    No response is required to paragraph "100." To the extent that a response is required, Vytalize repeats and incorporates by reference its answers to paragraphs "1" through "99" as if fully set forth herein.

101.    Admitted.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Denied.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

106.    No response is required to paragraph "106."  To the extent that a response is required, Vytalize repeats and incorporates by reference its answers to paragraphs "1" through "105" as if fully set forth herein.

107.    Denied.

108.    Denied.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment)

109.    No response is required to paragraph "109."  To the extent that a response is required, Vytalize repeats and incorporates by reference its answers to paragraphs "1" through "108" as if fully set forth herein.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Vytalize denies the allegations of the unnumbered WHEREFORE clause of the Complaint and further denies that Plaintiffs are entitled to any relief sought in subsections "a" through "f" thereof.

**VYTALIZE'S DEFENSES AND AFFIRMATIVE DEFENSES**

Without assuming the burden of proof as to the following, other than the burden imposed by law, Vytalize further asserts the following defenses and affirmative defenses:

**First Defense**

The Plaintiffs fail to state a cause of action upon which relief can be granted because of, *inter alia*, Plaintiffs' bad acts as set forth in the Vytalize's defenses and counterclaims and the false and otherwise speculative and conclusory nature of their claims.

**Second Defense**

The Plaintiffs' claims are barred, in whole or in part, by the Plaintiffs' unclean hands, bad faith acts and/or breaches of fiduciary duties as set forth in Vytalize's defenses and counterclaims.

**Third Defense**

The Plaintiffs' claims are barred, in whole or in part, because of the Plaintiffs' fraudulent acts and/or fraudulent inducement as set forth in Vytalize's defenses and counterclaims.

**Fourth Defense**

The Plaintiffs' claims are barred, in whole or in part, because of the Plaintiffs' material misrepresentations and/or omissions as set forth in Vytalize's defenses and counterclaims.

**Fifth Defense**

The Plaintiffs' claims are barred, in whole or in part, because of the Plaintiffs' prior material breaches of the contracts at issue.

**Sixth Defense**

The Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, laches, estoppel, ratification and/or consent based on Vytalize's defenses and counterclaims.

**Seventh Defense**

The Plaintiffs' claims – and specifically, Plaintiffs' "Second Cause of Action: Breach of Contract—Amended Stockholders' Agreement" – are barred, in whole or in part, because they are premature and not ripe for adjudication.

**Eighth Defense**

The Plaintiffs' claims – and specifically, Plaintiffs' "Second Cause of Action: Breach of Contract—Amended Stockholders' Agreement" – are barred, in whole or in part, because Plaintiffs' fail to allege that there is any justiciable controversy.

**Ninth Defense**

The Plaintiffs' recovery, if any, is barred by the doctrine of unjust enrichment as set forth in Vytalize's defenses and counterclaims.

**Tenth Defense**

The Plaintiffs' claims are barred, in whole or in part, because the Plaintiffs' damages, if any, were not caused by any acts or omissions of Vytalize.

**Eleventh Defense**

The Plaintiffs' claims are barred, in whole or in part, because the Plaintiffs have suffered no damages as a result of any actions or alleged actions by Vytalize.

**Twelfth Defense**

The Plaintiffs' claims are barred, in whole or in part, because they failed to mitigate any damages and, instead, have continued bad acts as set forth in the Vytalize's defenses and counterclaims.

**Thirteenth Defense**

The Plaintiffs' recovery, if any, must be offset against amounts the Plaintiffs owe to Vytalize.

**Fourteenth Defense**

The Plaintiffs' claims are barred, in whole or in part, by the parol evidence rule.

**Fifteenth Defense**

The Plaintiffs' claims are barred, in whole or in part, because they are duplicative of the Plaintiffs' breach of contract claim.

**Vytalize's Reservation of Rights**

Vytalize reserves its right to amend or supplement its Answer, Affirmative Defenses and Counterclaims. Vytalize denies any remaining allegations in the Complaint not expressly admitted herein.

## VYTALIZE'S COUNTERCLAIMS

Vytalize Health, LLC ("Vytalize"), by and through its undersigned counsel, asserts the following counterclaims against Michael Guarino, individually and in his capacity as the Sellers' Representative (as that term is defined in the Purchase Agreement, defined below), and Marissa Guarino, individually, and, in support thereof, alleges as follows upon information and belief:

### NATURE OF THE ACTION

1.      These counterclaims seek monetary damages and other relief to redress the Guarinos' egregious misconduct and breaches of their legal obligations to Vytalize and its subsidiary, Practice Management of America ("PMA") (Vytalize and PMA are hereinafter collectively referred to as the "Company"). Specifically, these counterclaims concern Michael and Marissa Guarino's unlawful competition, solicitation of customers and employees, misappropriation of the Company's financial and other resources, taking and misuse of the Company's confidential information, defamatory statements, and other misconduct.

2.      On February 7, 2023, Vytalize, a value-based care platform for physicians and practices, acquired a controlling interest in PMA, a business founded and owned in part by the Guarinos. Through the acquisition, Vytalize intended to expand its network of physician practices, achieve other strategic goals, and grow the existing businesses. To protect Vytalize's substantial investment in PMA, the Guarinos each agreed to certain post-closing restrictive covenants and to dedicate their full time and skill to the business and interest of the Company as the full-time President and Chief Operating Officer, respectively, of PMA.

3.      Notwithstanding these protections, the Guarinos promptly breached their legal obligations to the Company and engaged in material misconduct detrimental to the Company's success.  Specifically, the Company has discovered that the Guarinos focused their time and

attention on forming, owning, and operating competing businesses, such as Meta Care, Inc. ("Meta Care") and its new subsidiaries, such as Encounter Billing LLC ("Encounter Billing").

4.    To that end, the Guarinos have (i) solicited the Company's customers and employees to join Meta Care's businesses, (ii) misappropriated company resources including using the Company's money, time, employees, and email systems to further their other business endeavors, (iii) abused their senior positions to create market confusion between the Company and Meta Care to usurp the Company's business opportunities and improperly trade on its goodwill, (iv) disparaged the Company to its own customers and staff with outlandish lies, and (v) otherwise mismanaged and damaged the Company's business relationships and operations.

5.    The Guarinos engaged in these activities with the understanding and intention that such activities would harm the Company and promote their other, new outside businesses.

6.    Indeed, the King and Queen thrones that the Company has discovered the Guarinos installed in PMA's conference room, which they occupied during meetings, serve as a chilling reminder that the Guarinos believe they can operate under a different set of rules: their own.



7.     The Company has asserted these counterclaims to hold the Guarinos accountable for their unlawful activities, which have caused the Company to suffer and continue to suffer millions of dollars in damages including, without limitation, substantial damages to the Company's customer and business relationships, loss of employee relationships, substantial salaries and benefits paid to the Guarinos' for their purported "full-time" employment, and irreparable harm to the goodwill purchased by Vytalize in its acquisition of PMA.

## THE PARTIES

8.     Vytalize is a Delaware limited liability corporation headquartered at 2 Hudson Place, Hoboken, New Jersey.

9.     Michael Guarino is an individual who, upon information and belief, resides primarily in Florida. Michael Guarino is also the Sellers' Representative, as that term is defined in the Equity Purchase Agreement entered into on February 7, 2023 by and among, *inter alia*, Vytalize and PMA (the "Purchase Agreement").

10.     Marissa Guarino is an individual who, upon information and belief, resides primarily in Florida.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Vytalize's counterclaims pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Vytalize and the Guarinos and the amount in controversy exceeds $75,000.

12.     This Court also has jurisdiction over Vytalize's counterclaims because the parties agreed in Section 12(C) of the Employment Agreements, defined below, and Section 11.18 of the Purchase Agreement, defined below, that this Court shall have jurisdiction to adjudicate any disputes arising out of or relating to the parties' rights and obligations under those agreements.

13.    Venue is proper in this district under 28 U.S.C. § 1391 because the Guarinos are subject to personal jurisdiction of and regularly conduct business in this district.

14.    Venue is also proper in this district because the parties agreed in Section 12(C) of the Employment Agreements and Section 5.14 of the Purchase Agreement that this Court shall be the proper venue for any disputes arising out of or relating to the parties' rights and obligations under those agreements.

## FACTUAL ALLEGATIONS

**A. Vytalize Purchased PMA and Certain Affiliate Businesses to Expand its Network of Physician Practices and Achieve Other Strategic Goals**

15.    Vytalize is a health care company that operates several Medicare Accountable Care Organizations supporting independent primary and specialty care physicians and their practices. Vytalize provides a care platform for doctors and practices to strengthen relationships with their patients through data-driven and personalized care and lowered healthcare costs. By delivering the right data at the right time to physicians and their practices, Vytalize aims to make its physician customers more efficient and effective, allowing them to focus on personalized medicine for their patients.

16.    In or around late 2021 or 2022, Vytalize indicated its interest in purchasing PMA, a business founded and owned in part by the Guarinos.

17.    PMA provides clinical care management, care coordination, and administrative services such as full-service billing and collections, human resources, payroll and group purchasing benefits across over a thousand locations.

18.    Vytalize also indicated its interest in purchasing certain affiliated businesses of PMA, including:

a.      Independent Practice Association of New York ("IPANY"), a multi-specialty, physician-led Independent Physician Association ("IPA") owned and managed by PMA, and  which is dedicated to improving the quality of care for patients across the State of New York with a network of over 3,000 primary care providers and specialists committed to providing comprehensive, cost-effective, and coordinated healthcare services to patients;

b.      Salus Billing ("Salus Billing"), a full-service billing company fully owned and operated by PMA, and which services PMA's customers by, among other things, providing data entry of all charges, coding review and assistance, receivable management, follow-up on unpaid claims, physician credentialing, weekly claims reporting, collection services, and billing and submitting claims directly to insurance carriers;

c.      The Westchester Management Services Organization, Inc., which is owned by PMA; and

d.      Westchester Management Services Organization, LLC, which is owned by The Westchester Management Services Organization, Inc.

19.    Through a potential acquisition of PMA and certain of its affiliated businesses, Vytalize expected to expand its network of physician practices (i.e., its customer base), grow its presence in the market, gain skilled employees, and achieve other strategic goals. Vytalize also hoped to obtain the Guarinos' professional guidance and full-time dedication to the business.

20.    To that end, on February 7, 2023, Vytalize entered into the Purchase Agreement with PMA to acquire PMA and certain of its affiliated businesses, including IPANY, Salus Billing, the Westchester Management Services Organization, Inc., and Westchester Management Services Organization, LLC.

21.     As part of the Purchase Agreement, the parties agreed that Vytalize would acquire PMA from its shareholders, including the Guarinos, in exchange for a total payment of about $100,000,000.

**B. The Guarinos Agreed to Reasonable Restrictive Covenants in the Purchase Agreement to Protect Vytalize's Substantial Investment**

22.     To protect the value and benefits of Vytalize's substantial investment in PMA and its affiliated businesses, the Guarinos each agreed to certain post-closing restrictive covenants in the Purchase Agreement as a condition to the consummation of the transaction. Those obligations primarily prohibited the Guarinos from (i) competing against the Company and Vytalize's newly acquired businesses, (ii) soliciting or interfering with customers or employees, and (iii) improperly using or disclosing the Company's confidential information.

23.     Specifically, in Section 5.3 of the Purchase Agreement, entitled "Transition," the Guarinos agreed that:

> None of the Sellers shall take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier, or other business associate of the Group Companies from maintaining the same business relationships with the Group Companies after the Closing as it maintained with the Group Companies prior to the Closing.

24.     In Section 5.4 of the Purchase Agreement, entitled "Confidentiality," the Guarinos agreed not to misuse the Company's confidential information:

> Each Seller agrees not to disclose or use any Confidential Information, except that, if and as long as a Seller who is a natural Person is an employee of the Group Companies after the Closing, then such Person may use the Confidential Information in the ordinary course of such Person's employment on behalf of the Group Companies so long as such use is in compliance with all policies and agreements applicable to such Seller.

25.     Pursuant to Section 5.5 of the Purchase Agreement, entitled "Covenant Not to Compete," the Guarinos agreed that for a period of five years following the closing date, they shall not conduct competitive activities:

> Each Restricted Seller hereby agrees that…such Restricted Seller…and such Person's Affiliates shall not, directly or indirectly, (a) engage in any manner in a business that competes with the Business within the Restricted Area, or (b) provide information to, solicit or sell for, organize or own any interest in, manage, control, provide financing to, participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), consult with or become employed by or engaged by, provide services to, or act as agent for, any person, corporation, or other entity that is directly or indirectly engaged in the Business in the Restricted Area[.]

26.     The "Restricted Area" was defined in the Purchase Agreement as within the States of New York and New Jersey.  The "Business" was defined as:

> [T]he business of (a) providing management, negotiation and strategic planning, financial analysis, revenue cycle analytics and other services to independent physician associations, physician members, institutions, and employers and (b) providing any other products or services which are set forth in the [PMA] business plan attached hereto[.]

27.     Pursuant to Section 5.6 of the Purchase Agreement, entitled "Covenant Not to Solicit," the Guarinos also agreed that for a period of five years following the closing date, they would not solicit or interfere with the Company's business relationships or disparage the Company:

> During the Restricted Period, each Restricted Seller will not . . . (a) call upon, solicit or provide services to any Customer with the intent of selling or attempting to sell any products or services, (b) hire or engage or recruit, solicit or otherwise attempt to employ or engage or enter into any business relationship with any Person employed or engaged by any Group Company, or induce or attempt to induce any Person to leave such employment or engagement, or (c) in any way interfere with the relationship between any Group Company and any employee, Customer, sales representative, supplier, licensee or other business relation (or any prospective supplier, licensee, or other business relationship (which term "business relationship" shall not include Customers)) of any Group Company (including by making any negative or disparaging statements or communications regarding Buyer, any Group Company, any of their Affiliates, or any of their operations, officers, directors or investors).

28.     Pursuant to Section 11.11 of the Purchase Agreement, the Guarinos agreed that "the character, periods and geographical area and the scope of the restrictions on the Sellers [i.e., the

Guarinos'] activities in Section 5.5 and Section 5.6 are fair and reasonably required for the protection of Buyer and its Affiliates."

29.     In Section 11.11, the Guarinos further agreed that "irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached," and that the Company "shall be entitled to an injunction or other equitable relief in any court of competent jurisdiction, without any necessity of proving damages or any requirement for the posting of a bond or other security, enjoining any such breach (including a breach of Section 5.5 and Section 5.6) . . . ."

**C. The Guarinos Also Agreed to Reasonable Restrictive Covenants and Standards of Performance in their Employment Agreements**

30.     As a further inducement and condition to the consummation of the sale of PMA to Vytalize, the Guarinos each entered into employment agreements with the Company effective as of the closing date on February 7, 2023 (each, an "Employment Agreement" and together, the "Employment Agreements").

31.     The Company agreed to pay each of the Guarinos substantial salaries and benefits in exchange for their full-time employment as senior leaders of the Company.

32.     Specifically, the Company agreed to pay Mr. Guarino $750,000 annually as President of PMA, and to pay Ms. Guarino $375,000 annually as Chief Operating Officer of PMA during the terms of their employment, in addition to other substantial benefits.

33.     In Section 2(A) of the Employment Agreements, the Guarinos agreed "that at all times Employee, utilizing Employee's ability, experience, and talent, will faithfully perform all duties that may be required of the Employee pursuant to the terms of this Agreement."

34.     In Section 2(B) of the Employment Agreements, the Guarinos agreed that they "will devote [their] full time, relevant attention, knowledge, and skill to the business and interest of the

Company." Except for the activities set forth as "Permitted Outside Activities," the Guarinos agreed that they will not hold an interest, directly or indirectly, in any form fashion, or manner, as partner, officer, director, stockholder, advisor, employee, or in any other form or capacity, in any business in direct competition with the Company's business."

35.    In Schedule A to Mr. Guarino's Employment Agreement, Mr. Guarino disclosed the following Permitted Outside Activities:

   a.    "Advisory Board Member for, and equityholder of, Stellar Health";

   b.    "Advisory Board Member for Elevance Health";

   c.    "Administrator for ASC in Ocala Florida";

   d.    "Consultant to North Shore Surgi-Center";

   e.    "Equityholder in Care2U";

   f.    "Equityholder Glucose Guards, LLC"; and

   g.    "Chief Financial Officer of A.M. Surgical[.]"

36.    In Schedule A to Ms. Guarino's Employment Agreement, Ms. Guarino disclosed the following Permitted Outside Activities:

   a.    "Equityholder in Care2U";

   b.    "Equityholder Glucose Guards, LLC"; and

   c.    "All activities related to the inventions set forth on Exhibit 1[.]"

37.    In Exhibit 1 to Ms. Guarino's Employment Agreement, Ms. Guarino disclosed the following "prior inventions":

   a.    "Hipaalock – A product that designed to store patient specimens and PHI in a secured locked container that is temperature controlled"; and

   b.    "SAMI – A SAAS program that allows customers to create a customized message that is auto-dialed to whoever they are outreaching to."

38.     The Guarinos agreed that, "except for the Permitted Outside Activities, Employee shall not maintain concurrent employment that in any way interferes with the performance of Employee's duties for the Company and, other than the Permitted Outside Activities, shall promptly disclose any such concurrent employment to the Company."

39.     The Guarinos further agreed that, "[i]n engaging in the Permitted Outside Activities, Employee expressly agrees that Employee shall not engage in any conduct that violates this Agreement."

40.     In Sections 3(A) and (B) of the Employment Agreements, the Guarinos agreed "to observe and abide by all applicable rules and procedures of the Company that have been made available to Employee, including the Employee Handbook, Code of Conduct, and other policies" and to "comply with all reasonable regulations and instructions from time to time issued by the Company[.]"

41.     Attached to the Employment Agreements and incorporated by reference into Section 8 of the Employment Agreements, the Guarinos entered into Non-Disclosure/Non-Solicitation/Non-Competition and Invention Assignment Agreements setting forth certain restrictive covenants applicable to the Guarinos (each, a "Restrictive Covenant Agreement" and together, the "Restrictive Covenant Agreements").

42.     In Section 1 of the Restrictive Covenant Agreements, the Guarinos agreed that during the term of their employment and thereafter they would not use or disclose any Confidential Information of the Company.

43.     In Section 3 of the Restrictive Covenant Agreements, the Guarinos agreed not to engage in any activities that would conflict with their employment with the Company:

> Except in connection with my interests or involvements with the companies listed on Schedule A attached hereto, I agree that, during the term of my employment

with the Company, I will not engage in any other employment, occupation or consulting related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that materially conflict with my obligations to the Company.

44.    In Section 4 of the Restrictive Covenant Agreements, the Guarinos agreed that for a period of two years following termination, they would not "solicit, induce, recruit or encourage or attempt to solicit, induce, recruit or encourage, any of the Company's employees . . . or hire or otherwise contract with any such employees . . . ."

45.    In Section 5 of the Restrictive Covenant Agreements, the Guarinos agreed that during their employment and for a period of two years following termination, they would not "interfere with the Company's relationships with its customers who reside in, or whose principal places of business are located in, [the states of New York and New Jersey], as applicable, or otherwise solicit such customers . . . ."

46.    In Section 6 of the Restrictive Covenant Agreements, the Guarinos agreed that during their employment and for a period of two years following termination, they would not compete with the Company in violation of the Restrictive Covenant Agreements:

I will not, either directly or indirectly, within [states of New York and New Jersey]: (i) serve as an advisor, agent, consultant, director, employee, officer, partner, proprietor or otherwise of any business in competition with the Company's Business (as defined herein) as conducted by the Company during the course of my employment with the Company, (ii) have any ownership interest in any entity that is in competition with the Company's Business (as defined herein) as conducted by the Company during the course of my employment with the Company (except for passive ownership of one percent (1%) or less of any entity whose securities have been registered under the Securities Act of 1933, as amended, or Section 12 of the Securities Exchange Act of 1934, as amended), or (iii) participate in the organization, financing, operation, management or control of, any business in competition with the Company's Business as conducted by the Company at any time during the course of my employment with the Company.

47.    The Restrictive Covenant Agreements defined the "Company's Business" as "the operation of a Medicare Accountable Care Organization (ACO) partnering with primary care

doctors, operating other Medicare value-based care programs, and each other material portion of the business of the Company and its subsidiaries . . . ."

48.    In Sections 6 and 11 , the Guarinos specifically agreed that the fulfillment of their obligations to the Company under the Restrictive Covenant Agreements were necessary "to protect the Company's Confidential Information and to preserve the Company's value, reputation, and goodwill" and that the obligations in the Restrictive Covenant Agreements, "in view of the nature of Company's Business, are reasonable and necessary to protect the legitimate business interests of Company."

### D. The Guarinos Promptly Breached their Legal Obligations to the Company by Competing and Interfering with the Company's Customers

49.    In addition to their contractual obligations, the Guarinos were each also in a fiduciary relationship with the Company by virtue of being employed by the Company in the positions of President and Chief Operating Officer, respectively, of PMA.

50.    Notwithstanding their contractual and fiduciary obligations, the Guarinos have owned, operated and/or formed undisclosed businesses that competed (and still compete) directly with the Company's businesses.

51.    Upon information and belief, in December 2022, the Guarinos founded and incorporated a business called Meta Care.

52.    Upon information and belief, Michael Guarino serves as President and Marissa Guarino serves as Chief Operations Officer of Meta Care.

53.    Meta Care purports to be a healthcare services provider which owns, manages, and operates primary care practices throughout the United States. Meta Care markets itself as a group of "disruptors in the healthcare landscape" and as "the brainchild of a remarkable duo known as the 'power couple' – Michael and Marissa Guarino." Its website gloats that "Leveraging [the

Guarinos' extensive knowledge, the Guarinos have launched Meta Care Inc., an innovative platform that continues their impactful journey."

54.     According to Meta Care's websites, it is "expan[ding] into new markets" and has "many lines of business that can help fulfill your healthcare needs from a solo practitioner to a 3,000-member independent physician association." Further, the Guarinos have represented to the marketplace that "they are set to introduce their groundbreaking model to fresh regions."

55.     More recently, the Guarinos updated Meta Care's services to include "META CARE IPA." The Guarinos market META CARE IPA as focused on "empowering physicians to maintain their independence. Further, the Guarinos state on Meta Care's website:

> As a member of our META CARE IPA, you gain access to a host of benefits, including enhanced payor agreements and clinical care support. Our goal is to alleviate the administrative burden from your office while targeting care gap closures, in line with the requirements set by payors.

56.     Several months after the sale, on or around September 11, 2023, as the purported "Chief Operating Officer" of Meta Care, Ms. Guarino filed a Form D with the Securities and Exchange Commission seeking to raise up to $10 million for Meta Care.

57.     Then, on or around October 11, 2023, the Guarinos incorporated Encounter Billing in the state of Florida.

58.     Ms. Guarino is named as the "Manager" in Encounter Billing's business filings with the Florida Division of Corporations.

59.     Encounter Billing describes itself as a full-service medical billing company.

60.     On October 19, 2023, Ms. Guarino reached out to the Company *for the first time* to ask "the best way to approach adding META CARE, Inc to our disclosure schedules in our employment agreements."  In that email, Ms. Guarino misrepresented to the Company that she and Mr. Guarino were merely "consultants" for Meta Care.

61.     The Guarinos never disclosed Encounter Billing to the Company.

62.     Instead, four days later, on October 23, 2023, Michelle Clancy, the Director of the Central Billing Office for the Company's full-service billing company, Salus Billing, sent an email on behalf of *Meta Care* to numerous customers of the Company, including in the States of New York and New Jersey, soliciting Meta Care's products and services (the "Solicitation Email"). In the Solicitation Email, Ms. Clancy described herself as "the newly appointed Sr. Director of Operations for Glucose Guards under MetaCare."

63.     The Company discovered the Solicitation Email because it was forwarded by a customer of the Company to the attention of one of the Company's billing managers.

64.     In the Solicitation Email, Meta Care marketed services for Encounter Billing, which, according to the Solicitation Email, is "owned and operated by Michael and Marissa Guarino" and is "the exclusive billing company of MetaCare."

65.     The Solicitation Email broadly marketed Encounter Billing's "full-service billing" offerings to the Company's customers and directed those customers to contact Ms. Clancy to set up billing accounts.

66.     Specifically, the Solicitation Email stated:

For all those interested in a full-service billing company, Encounter Billing services all practices as a total RCM billing company with 20+ years of billing experience in specialties including but not limited to RPM, Hospital at Home, Internal Medicine, Family Practice, Pediatrics, Cardiology, Gastroenterology, Anesthesia, Outpatient ASC, and so much more. Please reach out to mclancy@metacareusa.com for more information.

67.     In job postings on LinkedIn, Zip Recruiter, Trabajo, and other employment networking sites, Encounter Billing described itself as "a rapidly growing billing company looking for bright, hardworking, and motivated individuals to join a team of experienced billers . . . ." Upon information and belief, the Guarinos have since deleted those job postings.

68.    At the time she sent the Solicitation Email, and until the effective date of her resignation at the end of October 2023, Ms. Clancy was also the Director of the Central Billing Office for the Company's own full-service billing company, Salus Billing.

69.    In Ms. Clancy's Meta Care offer letter signed by Ms. Guarino, as Meta Care's Chief Operating Officer, and sent to Ms. Clancy through the Company's email,  Ms. Clancy's start date with Meta Care was defined as October 10, 2023, but her full Meta Care salary did not begin until November 6, 2023. The offer letter also stated that, effective October 10, 2023, Ms. Clancy shall report directly to Ms. Guarino, as COO of Meta Care.

70.    Additionally, at the time of the Solicitation Email, Mr. Guarino was the sole manager of Salus Billing, and Ms. Guarino was intimately involved in Salus Billing's operations, including its management, oversight, staffing, and service offerings.

71.    Ms. Clancy also reported directly to Ms. Guarino at Salus Billing.

72.    In their roles with the Company, the Guarinos and Ms. Clancy directly managed Salus Billing and had access to all of Salus Billing's highly confidential information including, without limitation, its internal systems, business information, customer information, and employee information.

73.    Within days after sending the Solicitation Email on behalf of Meta Care, Ms. Clancy and the Guarinos attended the Watermill Event on behalf of the Company, a large company-wide event attended by employees, business partners, and customers of the Company, at which they mingled with customers and other business contacts of the Company.

74.    In the post-close business plan (the "Post-Close Business Plan") attached to the Amended and Restated Stockholders' Agreement of Practice Management of America, Inc., the form of which was attached as an exhibit to the Purchase Agreement, the Guarinos agreed that the

billing services provided by Salus Billing to the Company's customers were "considered to be an important support service for practices" and that the "goal will be to grow Salus Billing's billing services 20% year over year within the PMA network and possibly to expand these services to other Vytalize markets starting in 2024."

75.     However, instead of fulfilling their obligations to the Company, the Guarinos mismanaged the Company's businesses and promoted the interests of Meta Care and Encounter Billing.

76.     Indeed, while the Guarinos were forming and running their competitive businesses, Salus Billing failed to grow under the Guarinos' leadership and achieved none of the 20% growth target to which the Guarinos agreed in the Post-Close Business Plan.  Instead, during this time, Salus Billing received numerous customer complaints regarding significant issues with unaddressed receivables and collections, thereby damaging the Company's relationships with its customers and opening the Company to significant liabilities concerning the same.

77.     According to the Guarinos, multiple customers of the Company have approached them about switching their billing services from Salus Billing to Encounter Billing (*see* the Guarinos' Complaint, Dkt. 1 at ¶ 67), including those customer practices that have been left in arrears because of the Guarinos' mismanagement of the Company's businesses.

78.     Despite this, the Guarinos failed to address the issues with Salus Billing and instead focused their time on forming and operating competing businesses.

79.     Indeed, the Guarinos continue to solicit the Company's customers in the states of New York and New Jersey.  As recently as the end of February 2024, Ms. Clancy and Ms. Guarino emailed and/or called employees of the Company demanding confidential customer information for purposes of facilitating Meta Care's solicitation of the Company's customers.

**E. The Guarinos Breached their Legal Obligations to the Company by Soliciting the Company's Employees**

80.     In the late summer and the fall of 2023, Ms. Guarino attended meetings with Carina Unger, Vytalize's VP, People Operations, and Alicia Simms, Vytalize's People Operations Business Partner, to discuss the post-sale transfer of PMA employees to Vytalize.

81.     During those meetings, Ms. Guarino provided feedback to Ms. Unger and Ms. Simms regarding PMA employees, their job duties and performance histories, and other information for purposes of informing Vytalize's decisions about which employees would transfer to Vytalize.

82.     Ms. Guarino's feedback on PMA employees was important to Vytalize's decision-making process because she previously admonished Vytalize for speaking directly with PMA employees, thereby purposefully limiting direct contact between Vytalize and PMA's employees.

83.     Specifically, on April 23, 2023, Ms. Guarino emailed Ms. Simms stating: "I understand you met with Shannon [a PMA employee] last week and asked her what her job duties and responsibilities are and requested to have a 2nd call with her on Friday; why? These folks report to me and if you have questions regarding their job functions please come to me. It's disruptive and confusing to my team."

84.     In follow up meetings with Ms. Simms, Ms. Guarino stated something to the effect of "I am the mothership, and everything goes through me." In an email to Vytalize's CEO on April 24, 2024, Ms. Guarino said, "Why would [Vytalize] HR need to be on 1:1 calls with my managers to 'understand their roles'? Ask me; I will inform them of what they need to know."

85.     Meanwhile, the Guarinos used their direct access to the Company's employees to benefit their undisclosed roles in owning and operating competing businesses.

86.    For example, the Company told the Guarinos that it intended to retain and transfer Salus Billing's employees to Vytalize. Despite this, the Guarinos solicited at least two Salus Billing employees to Meta Care and/or Encounter Billing, including (i) Ms. Clancy, who voluntary resigned from the Company effective at the end of October 2023 and, in the meantime, sent the October 23 Solicitation Email for Meta Care, and (ii) Elizabeth Rodriguez, a former Salus Billing billing specialist who resigned from the Company effective November 13, 2023, and who, upon information and belief, started with Meta Care on November 14, 2023.

87.    Ms. Guarino and Ms. Clancy improperly misappropriated the Company's resources by circulating drafts of Ms. Clancy's and Ms. Rodriguez's Meta Care offer letters with signature lines for Ms. Guarino, as COO of Meta Care, in October 2023 using the Company's email system.

88.    In or around November 2023, the Company discovered that the Guarinos were directing Anthony Demetracopoulos, a current full-time employee of the Company, to conduct legal work for Meta Care. The Guarinos also unilaterally noted on a Meta Care organizational chart circulated through the Company's email that Mr. Demetracopoulos would act as Meta Care's General Counsel.

89.    The Guarinos further informed the Company that Frank DiMotta, another current employee of the Company, said he wanted to "move" to Meta Care.

90.    Upon information and belief, the Guarinos solicited several other PMA employees to Meta Care including, but not limited to: Candi Dunham – a former Nurse Care Manager for PMA and who was or is a Care Manager for Meta Care; Cristina Spiegel – former Director of Recruitment for PMA and who was or is Director of Organizational Development and Talent Management/Engagement for Meta Care; Judi Anderson – a former Clinical Associate for PMA and who was or is a Care Manager for Meta Care; Michelle Bonat – a former supervisor for PMA

and who was or is a Patient Navigator for Meta Care; Patricia Mullarkey – a former Clinical Care Manager for PMA and who was or is a Care Manager for Meta Care; and Michelle Foerster – a former Assistant Clinical Coordinator for PMA and who was or is a Care Manager for Meta Care.

**F.  The Guarinos Breached their Legal Obligations to the Company by Misappropriating Company Funds and Resources**

91.    The Guarinos used PMA as their personal bank account, improperly expensing personal items to PMA including, without limitation, cigars, online shopping, food delivery, international vacations, charitable and political donations, and television streaming services and subscription charges.

92.    Between 2022 and 2023, the Guarinos expensed about $58,231 to PMA for cigar purchases from Cigar Castle, Cigars Direct, and other cigar distributors. They also expensed thousands of dollars to PMA for online shopping through Amazon and for food delivery services. Upon information and belief, in the summer of 2022, the Guarinos expensed to PMA non-business-related trips to Greece and France, including their airfare. Upon information and belief, they expensed other items to PMA while they were on those trips, including an almost $1,500 stay at the Divani Apollon Palace Athens and almost $9,000 to a Monaco cruise line.

93.    In 2022, the Guarinos improperly expensed to PMA personal charitable and political donations, including a $1,000 payment to a political candidate in Kentucky and tens of thousands of dollars in payments to various Catholic charities and centers.

94.    In 2022, the Guarinos caused PMA to pay them and Ms. Guarino's brother, Henry Wolfe, substantial sums for "consulting" services, in addition to their salaries and employment benefits. Upon information and belief, in 2022, PMA paid: (i) about $481,200 to Guarino Healthcare Management, a company at which, according to its website, Mr. Guarino serves as "President, Owner, and Visionary" and Ms. Guarino serves as Vice President of Business

Development, (ii) about $435,000 to WolfeCare Consulting LLC, a company whose "leadership team," according to its website, is composed of Ms. Guarino, her brother, and her son, and about $155,600 to Rozln IT Services, at which Henry Wolfe served as President. Upon information and belief, none of these consulting arrangements were documented through written consulting agreements.

95.    The Guarinos also misused the Company's time, personnel, and other resources. While the Guarinos should have been serving as PMA's "full-time" President and Chief Operating Officer, the Guarinos incorporated, owned, and devoted their time to building, operating and marketing Meta Care and Encounter Billing, competitive businesses beyond any Permitted Outside Activities disclosed in their Employment Agreements.

96.    In fact, the Company has since discovered a February 22, 2023 email where Ms. Guarino notified all of the PMA shareholders involved in the sale that "[w]e will keep you informed when we move forward [with] our new company we created Meta Care, Inc."

97.    In March and April of 2023, the Guarinos expensed the Company for their attendance at a conference in Orlando, Florida and a meeting in New York City, each of which the Guarinos used to cultivate relationships with representatives of CVS before proposing a deal between Meta Care and CVS in or around May of 2023.

98.    With respect to the business proposal between Meta Care and CVS, the deal originated as a partnership between PMA and CVS; however, on March 27, 2023, Ms. Guarino forwarded the Guarinos' emails with CVS from the Company's email account to her Meta Care email account. Ms. Guarino then emailed a CVS representative that "Michael [Guarino] and I thoroughly enjoyed meeting you at your office [in New York] to discuss how we could partner" and "I'm using my Meta email as our partnership [will] be thru Meta."

99.    On or around September 11, 2023, as the purported "Chief Operating Officer" of Meta Care, and while still employed as the full-time Chief Operating Officer of PMA, Ms. Guarino filed a Form D with the Securities and Exchange Commission seeking to raise up to $10 million for Meta Care.

100.    The Guarinos also used the Company's personnel and resources – including its email – to conduct Meta Care and other business. For example, Ms. Guarino, Ms. Spiegel, and Ms. Clancy used the Company's email to circulate Meta Care's offer letters to Ms. Clancy and Ms. Rodriguez and to discuss the process of soliciting Ms. Rodriguez, stating that once the offer letter terms are finalized, the letter "goes to Marissa [Guarino] for signatures" by Meta Care.

101.    Additionally, the Company's email system was used: (i) between April and June 2023 by Ms. Guarino to coordinate and issue a proposal for care management support and services which she titled "Care Management / Meta(PMA)," (ii) in June 2023 by Ms. Guarino to discuss with JoAnn Marino, a current PMA employee, her analysis of Meta Care payroll concerns, (iii) in September 2023 by Ms. Guarino to coordinate the shipping of Meta Care materials, (iv) in October 2023 by Ms. Clancy and Ms. Bonat to circulate a Meta Care month-end report, and (v) in October 2023 by Ms. Clancy and Ms. Spiegel to discuss Meta Care team survey results.

102.    In or around June 2023, Ms. Guarino included Ms. Marino, a full-time employee of PMA, on communications relating to Meta Care's business and directed Ms. Marino to attend meetings relating to Meta Care/Glucose Guards business.

103.    The Guarinos also used the Company to benefit and promote Meta Care's competitive business. In emails dated May 30, 2023, a customer of the Company asked Ms. Guarino whether any investment opportunities were discussed in a meeting he missed, to which

Ms. Guarino responded (via the Company's email) "nothing discussed at this meeting but there will be something forthcoming with our spin off company called Meta Care, Inc."

104.    From November 1, 2022 through September 30, 2023, the Guarinos sublet a 465 square foot space from PMA to operate their Glucose Guards business but never paid PMA for their use of the space, amounting to about $14,058 in free rent for Glucose Guards. Indeed, the Guarinos continue today to use this space to store Glucose Guards materials without payment of rent. Although the Company has attempted to ship these materials to the Guarinos, the Guarinos informed the Company that the materials should remain in PMA's space because Glucose Guards did not have the space to store or receive these materials.

### G. The Guarinos Breached their Legal Obligations to the Company by Purposefully Creating Market Confusion to Harm the Company

105.    The Guarinos have created market confusion between the Company and Meta Care in order to harm the Company and to benefit the Guarinos' other businesses.

106.    In particular, the Guarinos engaged in deceptive marketing and advertising of their competing businesses, suggesting that Meta Care is simply a continuation of PMA under a different name to divert business from the Company by trading on and misappropriating the goodwill that Vytalize had agreed to purchase for over $100 million.

107.    There are many examples of the Guarinos' deceptive practices and diversion. As early as February 2023, and before Ms. Spiegel resigned from her job as PMA's Director of Recruitment for PMA to work in a similar role for Meta Care, the Guarinos used Ms. Spiegel to recruit a Medical Director for a customer of the Company and then directed the customer's payment of the recruiting invoice to Meta Care instead of PMA.

108.    Again, in February 2023, Ms. Guarino emailed that same customer – who had previously signed a PMA recruitment agreement in November 2022 – a Meta Care recruitment agreement.  In communications with the customer, Ms. Guarino wrote:

> We have created a new company that will house a few of our services one of which is our recruitment division; we need to reassign the recruitment agreement to our new company which is Meta Care; I simply updated the current agreement that we can either re-execute for ease or I can have our attorney draw up a re-assignment letter? I will connect our accounts receivable department with your finance team to work out the payment logistics as I believe an invoice will be soon generated for the current NP that we were able to place.  I understand that Cristina [Spiegel, a PMA employee] is working on two additional positions for you; I am pleased that things are working out and that we are able to help you. Who shall we reach out to for invoicing? Can you please sign attached and we will replace it over the last one.

109.    In other emails with former customers of PMA, Ms. Guarino referenced Meta Care as "META CARE, INC *formerly Practice Management of America, Inc. 'PMA'" and proposed a meeting to "share further with you our care management services," with the subject line "Care Management / Meta(PMA)."

110.    In other communications between Ms. Bonat (a former supervisor for PMA) and Ms. Guarino, Ms. Bonat's signature block for the Company's email address stated:

> **Michelle Bonat, Registered Medical Assistant**
> **Patient Navigator – *Now known as Meta Care, Inc. f/k/a "PMA"**
> Telephone:  **727-308-2854**
> **New email: mbonat@metacareusa.com**
> Right Care-Right Place-Right Time
> *Please note, due to an organization-wide restructure, all emails will be
> coming  from my new address of mbonat@metacareusa.com

111.    Ms. Bonat inaccurately referenced not only Meta Care as being "formerly known as PMA," but also an "organization-wide restructure" requiring directing emails to Ms. Bonat's new Meta Care email address. Ms. Guarino did not correct these misrepresentations.

112.    Similarly, in or around May 2023, a representative of Pinnacle Brokers sent the Guarinos the 2023 APG Conference attendee list, on which the Guarinos were listed out of the

state of New York and with the company name "Practice Management of America / Meta Care, Inc." The Guarinos did not correct this error.

113.    Moreover, in business transactions on behalf of the Company, the Guarinos conflated the Company and Meta Care to divert the Company's business opportunities to Meta Care.  For example, in multiple letters of intent on behalf of the Company to purchase a customer's practice or another Independent Physician Association in New York in 2023, the Guarinos incorrectly defined the purchaser of the practice as "Practice Management of America, Inc. *and/or Meta Care Inc*." (emphasis added).

114.    In or around May 2023, the Guarinos used the Company's email to communicate with Highlight Health, a company that provides affordable healthcare solutions to workers who are not eligible for traditional insurance. In response to an email from a representative of Highlight Health stating that: "It was great connecting and super excited about possibilities," Ms. Guarino sent Highlight Health nondisclosure agreements, stating "Please see attached both BAA/NDA with both companies we have (Meta and PMA)."

115.    The Guarinos' purposeful misrepresentations caused confusion between the Company and Meta Care among customers and other business relationships.

116.    For example, the Guarinos used such confusion to intercept a potentially beneficial business relationship for Salus Billing. On October 18, 2023, a representative of Inbox Health, a medical billing and collections communications support company (which advertises that "better patient [accounts receivable] is just a click away") reached out to Ms. Clancy stating "I spoke with a few team members who advised me that you are no longer with the company? Is this true? Where do we stand with this project as I know you had mentioned there is Salus [B]illing involved."

117.    Although Ms. Clancy was still, at the time, an employee of the Company and aware of Salus Billing's significant accounts receivable issues, she responded to the Inbox Health representative from the Company's email address that "I am transitioning out of this company to a new one who is interested in this service." She then provided the Inbox Health representative with her Meta Care email address.

118.    In other emails, the Guarinos used such confusion to intercept customer billing accounts. On November 7, 2023, a customer of the Company emailed Ms. Clancy and Ms. Guarino stating that she was "confused," and that Ms. Clancy had told her that Ms. Clancy "wanted to use a new billing company." The customer responded, "I'm not sure I understand why, because we use [S]alus [Billing], which is part of the Ipa/vitalize." Ms. Guarino forwarded the customer's email to Ms. Clancy's Meta Care email address. Responding from her Meta Care email address, Ms. Clancy informed the customer that her email address should be updated to Meta Care.

## H. The Guarinos Breached their Legal Obligations to the Company by Disseminating Defamatory Statements and Engaging in Other Misconduct

119.    In or around September 2023, while the Company was in the process of internally investigating a potential security incident, the Guarinos made material and untrue defamatory statements to the Company's staff and customers discrediting the Company's security efforts and software, including blatantly misinforming staff and customers that the Company was "spying" on them.

120.    The Guarinos were aware that their untrue statements had direct and negative consequences on the Company's relationships of trust with employees and customers. For example, a customer's practice manager said that the Guarinos told her Vytalize installed "spyware" on her personal device, an allegation that was not only completely baseless but also was made by the Guarinos to intentionally damage the Company's business relationships.

121.    The Guarinos further refused to send a communication to PMA's customers and staff to correct their disparaging and harmful statements despite explicit direction from the PMA Board of Directors requiring them to do so.

122.    In addition, Vytalize has discovered that the Guarinos have been disparaging Vytalize in the market including, without limitation, making untrue statements that Vytalize does not care about providers or the value of provider practices.

123.    The Guarinos engaged in other misconduct relating to the Company's business.  For example, the Guarinos:

a.    Failed to fulfill the credentialing and roster management responsibilities for the Company's customers resulting in numerous providers being identified as "out of network" with respective payor contracts and materially damaging the Company's provider and provider-patient relationships and, in at least one instance in July 2023, unilaterally and without notifying Vytalize, terminating a customer relationship after the customer raised concerns about mismanagement of credentialing and roster submissions;

b.    Failed to fulfill the Company's tax filing obligations, including by not obtaining W-9 forms from hundreds of eligible independent contractors who served as vendors to PMA or issuing Form 1099s for each such eligible vendor because the process was purportedly too onerous; and

c.    Lacked consistent and necessary engagement with customer practices after the sale of PMA and failed to meet agreed-upon growth targets to grow Salus Billing, ACO, ACO REACH, PRIDES primary care physician participation, IPA membership, participation of existing members in PMA payer contracts, and network shared savings.

124.    The Company continues to expend considerable time and resources to correct the lasting effects of the Guarinos' material misconduct.

**I.    The Guarinos Were Properly Terminated for Cause from their Employment and Other Roles with the Company**

125.    Based on the foregoing misconduct, the Guarinos were properly terminated for Cause from their employment with the Company on November 14, 2023 and removed, effective immediately, from all officer, director, manager, and other positions with the Company.

126.    On November 14, 2023, the Company also sent Mr. Guarino, as Seller's Representative, a claim for indemnification pursuant to Section 7.1(a)(ii) of the Purchase Agreement regarding the Guarinos' breaches of the restrictive covenants in Sections 5.4, 5.5 and 5.6 of the Purchase Agreement.

127.    On February 6, 2023, the Company sent Mr. Guarino, as Seller's Representative, and Citibank, N.A., as escrow agent, a second claim for indemnification pursuant to Sections 7.1 and 8.1 of the Purchase Agreement (the "Second Notice of Indemnification Claim").

128.    The Second Notice of Indemnification Claim made a demand for indemnification for all damages arising out of any and all breaches of the representations and warranties or other obligations of the Sellers including, without limitation, with respect to certain tax-related matters and disclosure inaccuracies.

129.    Specifically, the Second Notice of Indemnification Claim noticed the Company's claims relating to:

a.    The Guarinos' failure to fulfill the Company's tax filing obligations, including by not obtaining W-9 forms from hundreds of eligible independent contractors who served as vendors to PMA or issuing Form 1099s for each such eligible vendor because the process was purportedly too onerous;

b.      The Guarinos' practice of improperly expensing personal items and items relating to their other businesses, as described herein, which may directly impact requirements for PMA's withholding, collection, and/or payment of taxes, and give rise to liabilities including audits, fines, penalties, and interest; and

c.      The Guarinos' failure to disclose in the transaction Michael Guarinos' ownership and other interests in the property located at 1092 Jericho Turnpike, Commack, New York 11725, in which PMA leases office space.

130.    Upon information and belief, the Guarinos have continued to violate their continuing legal obligations to the Company and cause harm to the Company's relationships with its employees, customers, and other business affiliates.

131.    The Company has been and continues to be substantially and irreparably harmed by the Guarinos' misconduct and breaches.

132.    The Company has spent and continues to spend substantial resources in its attempts to resolve the issues caused by the Guarinos' misconduct.

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Michael and Marissa Guarino –
The Employment Agreements)**

133.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

134.    The Employment Agreements are valid and enforceable contracts.

135.    The Company has fully performed its obligations under the Employment Agreements.

136.    The Guarinos' actions, as described herein, including, but not limited to, engaging in competitive business and unapproved outside activities, soliciting the Company's customers

and employees, misappropriating the Company's financial and other resources, unlawfully taking and misusing the Company's confidential information, failing to comply with Vytalize's reasonable instructions, orders, and policies, failing to devote their full time and attention to the business, and otherwise mismanaging the business, constitute breaches of the Employment Agreements.

137.     As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial including.

138.     The Company is also entitled to recover reasonable attorneys' fees and costs pursuant to Section 11 of the Employment Agreements, and to injunctive relief restraining and enjoining the Guarinos from continuing to breach the Employment Agreements.

139.     The Company is entitled to injunctive relief restraining and enjoining the Guarinos from continuing to misappropriate and divert the Company's goodwill, customers, and employees.

## SECOND CAUSE OF ACTION

### (Breach of Contract Against Michael Guarino and Marissa Guarino –
### The Equity Purchase Agreement)

140.     Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

141.      The Purchase Agreement is a valid and enforceable contract.

142.     Vytalize has fully performed its obligations under the Purchase Agreement.

143.     The Guarinos' actions, as described herein, including, but not limited to, engaging in competitive business and unapproved outside activities, soliciting the Company's customers and employees, and unlawfully taking and using the Company's confidential information, constitute breaches of Sections 5.3, 5.4, 5.5 and 5.6 the Purchase Agreement.

144.    As a result of the Guarinos' misconduct, Vytalize has suffered damages in an amount to be proven at trial.

145.    Vytalize is entitled to recover reasonable attorneys' fees and costs pursuant to Section 5.7 of the Purchase Agreement, as well as injunctive relief restraining and enjoining the Guarinos from continuing to breach the Purchase Agreement.

## THIRD CAUSE OF ACTION

### (Breach of Contract – The Equity Purchase Agreement)

146.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

147.    The Purchase Agreement is a valid and enforceable contract.

148.    Vytalize has fully performed its obligations under the Purchase Agreement.

149.    The Guarinos' actions including, but not limited to (i) failing to fulfill the Company's tax filing obligations, (ii) improperly expensing personal items and items relating to their other businesses, and (iii) failing to disclose in the transaction Michael Guarinos' ownership and other interests in the property located at 1092 Jericho Turnpike, constitute breaches of Sections 3.8, 3.9, 3.10 and 3.21 of the Purchase Agreement.

150.    As a result of the Guarinos' misconduct, Vytalize has suffered damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing
### Against Michael and Marissa Guarino)

151.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

152.    The Guarinos entered into the Employment Agreements, the Restrictive Covenant Agreements, and the Purchase Agreement with the Company, each of which include an implied covenant of good faith and fair dealing.

153.    The Guarinos owed the Company duties to act in good faith and to conduct fair dealing.

154.    The Guarinos' actions, as described herein, including, but not limited to, those actions of the Guarinos which were intended to or had the effect of impairing or destroying the benefits the Company bargained for under the Employment Agreements, the Restrictive Covenant Agreements, and the Purchase Agreement, particularly customer, employee, and other business relationships and goodwill, constitute breaches of the implied duty of good faith and fair dealing.

155.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duties Against Michael and Marissa Guarino)

156.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

157.    The Guarinos each were in a fiduciary relationship with the Company by virtue of being employed by the Company in the positions of President and Chief Operating Officer, respectively, of PMA.

158.    The Guarinos each were also members of the Board of Directors of PMA and held board observer roles with Vytalize.

159.    Additionally, Michael Guarino was the sole member of Salus Billing.

160.    The Guarinos' actions during their tenure with the Company, as described herein, including, but not limited to, engaging in competitive business and unapproved outside activities, soliciting the Company's customers and employees, usurping corporate opportunities, misappropriating the Company's financial and other resources, unlawfully taking and misusing the Company's confidential information, making disparaging statements, failing to comply with the Company's reasonable instructions, orders, and policies, failing to devote their full time and attention to the business, and otherwise mismanaging the business, constitute breaches of their fiduciary duties to the Company.

161.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

### (Unjust Enrichment Against Michael and Marissa Guarino)

162.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

163.    The Company conferred substantial benefits on the Guarinos when the parties entered into the Employment Agreements, the Restrictive Covenant Agreements, and the Purchase Agreement including, but not limited to, employment and other positions of trust with the Company, payment of substantial salary, benefits, and other compensation, and access to the Company's and its affiliates' goodwill and confidential information.

164.    The Guarinos appreciated or had knowledge of, and accepted, the substantial benefits conferred upon them when they signed the Employment Agreements, the Restrictive Covenant Agreements, and the Purchase Agreement and took advantage of such substantial benefits.

165.    The Guarinos' acceptance of such substantial benefits is inequitable and the Guarinos are not entitled to the benefits received because the Guarinos engaged in material misconduct and breaches, as described herein.

166.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**(Unfair Competition Against Michael and Marissa Guarino)**

167.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

168.    As a result of the sale of PMA to Vytalize and the Guarinos' employment with the Company thereafter, the Guarinos had direct and unfettered access to the Company's confidential information and goodwill.

169.    The Guarinos misappropriated and continue to misuse the Company's confidential information and goodwill to benefit their other businesses, create market confusion, and divert the Company's goodwill to their other businesses.

170.    The Guarinos acted and continue to act in bad faith, including by their unlawful and improper use of the Company's employees, time, and other resources for competitive and undisclosed outside business activities, and intentional misrepresentation of the relationship between the Company and Meta Care, to improperly divert the Company's goodwill to their other businesses.

171.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### (Tortious Interference Against Michael and Marissa Guarino)

172.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

173.    The Company had business relationships and prospective business relationships with many third-parties including, but not limited to, employees of the Company, actual and potential customers of the Company, and actual and potential vendors and affiliates of the Company.

174.    The Guarinos knew of the Company's actual and potential contractual and business relationships with these third parties because, among other reasons, the Company disclosed this information to the Guarinos or the Guarinos had direct access to the Company's confidential information.

175.    The Guarinos' actions, as described herein, including, without limitation, engaging in competitive business and unapproved outside activities, soliciting the Company's customers and employees, misappropriating the Company's financial and other resources, creating market confusion between the Company and Meta Care, unlawfully taking and misusing the Company's confidential information, disparaging the Company, and otherwise mismanaging the business, intentionally interfered with the Company's relationships and potential relationships with these third parties without justification.

176.    The Company had a reasonable expectation that the aforementioned business relationships and potential relationships would result in the Company obtaining the benefit of these business opportunities. However, the Guarinos' wrongful actions directly caused the Company to lose or alter the business relationships described herein, to the Company's economic detriment.

177.    The Guarinos were aware of, and intended to cause, this detrimental impact on the Company's business relationships and prospective relationships.

178.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### (Misappropriation of Company Trade Secrets and Resources
### Against Michael and Marissa Guarino)

179.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

180.    The Company possessed certain confidential, non-public, and trade secret information – including, without limitation, customer information (including contact information, preferences, and business needs), personnel information (including contact and pay information, and other terms and conditions of employment), internal marketing and financial information, and non-public knowledge of the Company's business lines (including issues created by the Guarinos' own mismanagement of those business lines) – and company resources including, without limitation, the Company's funds, employees, time, and email systems.

181.    The Company communicated that confidential, non-public, and trade secret information to, and conferred company resources on, the Guarinos as a result of the sale of PMA to Vytalize and the Guarinos' employment with the Company thereafter.

182.    The Guarinos acknowledged the substantial benefits conferred on them and their access to (and the existence of) the Company's trade secrets and other resources when they signed the Employment Agreements, the Restrictive Covenant Agreements, and the Purchase Agreement and took advantage of such substantial benefits.

183.    The Guarinos understood and acknowledged that the Company communicated its trade secret information to the Guarinos with the understanding that the Guarinos would protect the secrecy of, and would not take or use, such information.

184.    The Guarinos' actions, as described herein, including, without limitation, misappropriating the Company's confidential information and trade secrets, financial resources, employees, time, and other resources, in breach of their legal obligations to the Company and to improperly benefit their other businesses constitutes misappropriation of the Company's trade secrets and resources.

185.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### (Violations of New York Deceptive Trade Practices Act
### Against Michael and Marissa Guarino)

186.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

187.    The Guarinos willfully or knowingly engaged in deceptive marketing and advertising of their competing businesses and made other misrepresentations to consumers to incorrectly suggest that Meta Care is a continuation of, or otherwise affiliated with, the Company.

188.    The Guarinos' deceptive conduct has misled or is likely to mislead consumers into believing that Meta Care is a continuation of or otherwise affiliated with the Company.

189.    The Guarinos' deceptive conduct has resulted in the diversion of business from the Company to Meta Care and its affiliates and interference with the goodwill transferred in connection with the sale of PMA to Vytalize.

190.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

191.    The Company is entitled to an increased award of damages pursuant to N.Y. Gen. Bus. Law § 349(h) because the Guarinos willfully or knowingly violated their obligations thereunder.

192.    The Company is entitled to injunctive relief restraining and enjoining the Guarinos from continuing to engage in such deceptive conduct and misappropriate and divert Vytalize's customers and goodwill.

193.    The Company is also entitled to recover reasonable attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349(h).

**ELEVENTH CAUSE OF ACTION**

**(Commercial Disparagement Against Michael and Marissa Guarino)**

194.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

195.    As set forth herein, the Guarinos knowingly and intentionally published false and injurious statements about the Company's business, including statements about how the Company operates its business.

196.    The Guarinos communicated these falsehoods to third parties including, but not limited to, employees, customers, and existing and potential business relations, and understood and intended that these false statements would have the effect of interfering with the Company's existing or prospective business relationships.

197.    As a result of the Guarinos' misconduct, the Company has suffered damages in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**

**(Declaratory Judgment Against Michael and Marissa Guarino)**

198.    Vytalize repeats and re-alleges each of the foregoing allegations, as if fully stated herein.

199.    An actual, justiciable controversy exists between the Company and the Guarinos regarding the Guarinos' termination for Cause from their employment and other positions with the Company.

200.    Such justiciable controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

201.    As a result of such controversy, the Company seeks a declaratory judgment that the Guarinos were properly terminated for Cause from their employment and other positions with the Company.

**JURY DEMANDED**

202.    Vytalize demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

WHEREFORE, Vytalize requests that this Court enter judgment in favor of Vytalize and:

a.    Dismiss the Guarinos' Complaint with prejudice;

b.    Deny any and all relief requested by the Guarinos' in their Complaint;

c.    Award Vytalize full compensatory and consequential damages in an amount to be determined at trial, together with pre- and post-judgment interest and costs;

a.    Enjoin the Guarinos from breaching and continuing to breach the Purchase Agreement, the Employment Agreements, and the Restrictive Covenant Agreements;

b.  Declare that the Guarinos were properly terminated for Cause from their employment and other positions with the Company;

c.  Award Vytalize costs, attorneys' fees, and expenses; and

d.  Grant such other and further relief to Vytalize as this Court deems just and proper.

Dated: New York, New York
       March 19, 2024

Respectfully Submitted,

**BROWN RUDNICK LLP**

By:  _s/ Emery L. Lyon_
     Dylan P. Kletter
     Emery L. Lyon
     Alessandra Maldonado*
     Seven Times Square
     New York, NY 10036
     Tel: (212) 209-4800
     Fax: (212) 209-4801
     dkletter@brownrudnick.com
     elyon@brownrudnick.com
     amaldonado@brownrudnick.com

     *Attorneys for Defendant and*
     *Counterclaim Plaintiff Vytalize Health LLC*

     *\*Pro Hac Vice* forthcoming

65296460

53